**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUIS ALBERTO CHIRINOS GONZALEZ,<br><br>                Petitioner,<br><br>v.<br><br>JEREMY CASEY, Warden of Imperial Regional Detention Facility of U.S. Immigration and Customs Enforcement, et al.,<br><br>                Respondents. | Case No.:  3:26-cv-01265-RBM-MMP<br><br>**ORDER GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[Doc. 1]** |

Pending before the Court are Petitioner Luis Alberto Chirinos Gonzalez's ("Petitioner") Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2241 (Doc. 1) and Ex Parte Motion for Temporary Restraining Order ("TRO Motion") (Doc. 2). For the reasons set forth below, the Petition is **GRANTED IN PART**.

## I.  BACKGROUND

### A.  Factual Background

Petitioner, a national and citizen of Venezuela, entered the United States on or around November 14, 2021.  (Doc. 1 ¶¶ 15–16.)  Petitioner was then detained, issued a Notice to Appear ("NTA"), and released on his own recognizance shortly thereafter.  (*Id.*

¶ 16; *see* Doc. 2-1 ¶ 5.)  Petitioner filed an asylum application in February 2023 and is also "a derivative beneficiary of his wife's asylum application, which has been pending since Spring 2022."  (Doc. 1 ¶ 18.)

On February 3, 2023, Petitioner was arrested for driving under the influence and subsequently convicted on January 10, 2024.  (*Id*. ¶ 21; *see* Doc. 10-2 at 3.)  On September 23, 2023, Petitioner applied for Temporary Protected Status ("TPS") under 8 U.S.C. § 1254a and "pursuant to the [2023] designation of TPS for Venezuela."  (Doc. 1 ¶ 19.)  "His application was granted on February 15, 2024."  (*Id*.; *see* Doc. 2-2, Ex. A at 5–6.)

On June 27, 2025, Petitioner "was arrested by ICE when he attended a probation appointment related to his driving under the influence conviction."  (Doc. 1 ¶ 22; *see* Doc. 10-2 at 2.)  He was then transferred and detained at the Rio Grande Processing Center in Texas.  (Doc. 1 ¶ 22.)  On September 1, 2025, Petitioner sought to renew his TPS pursuant to the most recent January 17, 2025 extension by submitting an Application for TPS on an I-821 Form.  (*See* Doc. 1 ¶ 19; Doc. 2-2, Ex. B at 8.)  Petitioner received a notice confirming receipt of his application.  (*See* Doc. 2-2, Ex. B at 8.)  On October 3, 2025, Petitioner was released from ICE detention under the Alternatives to Detention ("ATD") program "with an electronic ankle monitor and instructions to report to ICE."  (Doc. 1 ¶ 23; *see* Doc. 10-2 at 3.)

On or around January 4, 2026, Petitioner "was arrested and charged with misdemeanor violations of New York Vehicle and Traffic Law § 1198(9)(d) ('No person subject to a court ordered ignition interlock device shall operate a motor vehicle without such device.') and New York Vehicle and Traffic Law § 511 (aggravated unlicensed operation of a motor vehicle)."  (Doc. 1 ¶ 24.)  "After being detained for [about three hours]at the Nassau County Police station, [Petitioner] was transferred to federal immigration custody."  (*Id*.; *see* Doc. 2-1 ¶ 18.)  His new criminal charges remain pending and he is currently detained at the Imperial Regional Detention Facility.  (Doc. 1 ¶¶ 6, 24.)

**B.      Procedural Background**

On February 27, 2026, Petitioner commenced this action by filing the Petition.  (Doc.

3:26-cv-01265-RBM-MMP

1.) Petitioner also filed the TRO Motion that same day. (Doc. 2.) Pursuant to this Court's Order (*see* Doc. 3), Respondents filed a Return to the Petition on March 11, 2026. (Doc. 5.) Petitioner filed a Reply in Support of the Petition on March 12, 2026. (Doc. 7.)

The Court subsequently issued an Order for Supplemental Briefing. (Doc. 9.) Respondents filed Supplemental Briefing on April 21, 2026. (Doc. 10.) Petitioner filed a Response to Respondents' Supplemental Briefing on April 24, 2026. (Doc. 11.)

## II.    **LEGAL STANDARD**

A writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). The petitioner bears the burden of demonstrating that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(c)(3).

## III.    **DISCUSSION**

Petitioner claims his detention violates the Immigration and Nationality Act ("INA") and the Fifth Amendment's Due Process Clause. (Doc. 1 ¶¶ 4, 45–51.) Specifically, Petitioner claims he has TPS and therefore cannot be removed or detained under 8 U.S.C. § 1254a (the "TPS statute"). (*Id*. ¶¶ 1–2, 31–44.) Respondents acknowledge that Petitioner had valid TPS from February 15, 2024, to April 2, 2025, but contend Petitioner is properly detained because his TPS was terminated on November 20, 2025. (Doc. 10 at 2.) This action therefore hinges on whether Petitioner currently retains TPS.

**A.    INA**

**1.    TPS Statutory Framework and Venezuela's Designation**

The TPS program provides humanitarian relief to eligible nationals from countries experiencing conditions that make it unsafe or impossible for their citizens to return home.

3:26-cv-01265-RBM-MMP

8 U.S.C. § 1254a.  The Secretary of the United States Department of Homeland Security ("DHS") "may designate a foreign state for TPS when nationals of that state cannot return there safely due to armed conflict, natural disaster, or other 'extraordinary and temporary conditions.'" *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1010 (9th Cir. 2025) (citing 8 U.S.C. § 1254a(b)(1)(c)).  To receive TPS, individuals must have continuously resided in the United States since the effective date of the designation and must meet certain additional requirements.  *See* 8 U.S.C. § 1254a(c)(1)–(3).  TPS recipients cannot be removed from the United States while the designation is in effect.  § 1254a(a)(1)(A).  Additionally, the TPS statute provides that a noncitizen "provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the [noncitizen]'s immigration status in the United States." § 1254a(d)(4).

DHS first designated Venezuela for TPS in March 2021 and then re-designated Venezuela for TPS on October 3, 2023.  *See* 86 Fed. Reg. 13574 (Mar. 9, 2021); Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130 (Oct. 3, 2023) (the "2023 Designation").  TPS recipients under the 2023 Designation were given legal status and work authorization through April 2, 2025.  88 Fed. Reg. 68130 (Oct. 3, 2023).  On January 17, 2025, DHS extended the 2023 Designation through October 2, 2026.  *See* Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5961 (Jan. 17, 2025) ("2025 Extension").  However, in February 2025, former DHS Secretary Kristi Noem vacated the 2025 Extension and terminated the 2023 Designation.  *See* Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025); Termination of the October 3, 2023, Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025).

That termination and vacatur decisions were set aside in an action before the United States District Court for the Northern District of California, where the district court held

4

that such agency actions violated the Administrative Procedure Act ("APA").[1] *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1164 (N.D. Cal. 2025) (the "September 5th Order"). But on October 3, 2025, the United States Supreme Court stayed the district court's September 5th Order and allowed the termination of TPS for Venezuela to take effect "pending the disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and the disposition of a petition for a writ of certiorari, if such writ is timely sought." *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025).

On December 10, 2025, before the Ninth Circuit resolved the Government's appeal of the September 5th Order, the district court issued a declaratory judgment providing that: "(1) the vacatur of the January 17, 2025, TPS extension for Venezuela was unlawful as was (2) the termination of Venezuela's 2023 TPS [D]esignation on February 5, 2025." *Nat'l TPS All. v. Noem*, Case No. 25-cv-01766-EMC, 2025 WL 3539156, at *2 (N.D. Cal. Dec. 10, 2025) (the "December 10th Order"). Unlike the September 5th Order, which set aside the challenged vacatur and termination decisions, the district court reasoned it had authority "to issue [declaratory] relief . . . so long as the relief simply preserve[d] the status quo" and did "not materially alter the status of the case on appeal." *Id.*

On January 28, 2026, the Ninth Circuit affirmed the district court's September 5th Order. *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 748–49 (9th Cir. 2026).[2]

## 2.   Lawfulness of Petitioner's Detention

Petitioner argues his TPS "must be deemed valid" based on the declaratory judgment issued in the December 10th Order because it "has preclusive effect in [this] case, controlling the legal question of whether members of the National TPS Alliance . . . , such

---

[1]   The APA allows courts to "hold unlawful and set aside agency actions." 5 U.S.C § 706(2).

[2]   As of the date of this Order, a petition for a writ of certiorari has not been filed as to the appeal of the September 5th Order, and the Government's appeal of the December 10th Order remains pending in the Ninth Circuit.

3:26-cv-01265-RBM-MMP

as [himself], retain their TPS status."   (Doc. 1 ¶¶ 2, 33–34; *see* Doc. 11 at 4–5.) Respondents assert that although the "[d]istrict [c]ourt in *National TPS Alliance v. Noem* vacated [DHS's] vacatur of the TPS re-designation and termination of TPS for Venezuelans[,]"[3] Petitioner does not have TPS because "the Supreme Court has stayed [the September 5th Order] pending disposition of the Government's appeal in the Ninth Circuit and disposition of a petition for writ of certiorari in the Supreme Court."   (Doc. 10 at 2 (citing *Nat'l TPS All.*, 146 S. Ct. 23).)

Indeed, despite the Ninth Circuit's affirmance, the September 5th Order remains subject to a Supreme Court stay.   *See Nat'l TPS All.*, 146 S. Ct. at 24; *see also Vargas Sivira v. Noem*, Case No. 1:25-cv-01987-KES-EPG-HC, 2026 WL 221778, at *1 n.1 (E.D. Cal. Jan. 28, 2026), *report and recommendation adopted*, No. 1:25-CV-01987-KES-EPG (HC), 2026 WL 288172 (E.D. Cal. Feb. 3, 2026) (noting the Supreme Court's stay "allow[ed] the Secretary's vacatur and termination of Venezuela's TPS status to enter into effect").   And unlike the September 5th Order, the December 10th Order did not set aside the agency's challenged actions.   *See Nat'l TPS All.*, 2025 WL 3539156, at *3 (explaining that the Supreme Court "stayed the [district court's] final judgment setting aside the agency actions but still left open the door to declaratory relief").   Instead, the district court issued declaratory relief to "help preserve the pending status quo for individual members of the NTPSA. . . . possibly in individual actions where an individual member might receive some benefit from the declaratory judgment."   *Id*. at *2.   "This creates a thorny question as to whether [Petitioner] is entitled to release on the basis of his TPS; the declaratory judgment decision held that the termination of TPS was unlawful, but the Supreme Court has stayed any coercive effect of the holdings, meaning [Petitioner] does not currently hold valid TPS."   *O.G.M. v. Sage*, No. 4:26-CV-00780, 2026 WL 1242754, at *3 n. 35 (M.D. Pa. May 6, 2026); *see Nava v. Warden of Port Isabel Serv. Processing Ctr.*, CIVIL ACTION NO.

---

[3]  *See Nat'l TPS All. v. Noem*, 798 F. Supp. 3d at 1164.

1:26-CV-230, 2026 WL 1018343, at *6 (S.D. Tex. Apr. 15, 2026) ("Through this argument, Petitioner[ ] effectively request[s] that the Court go beyond the Declaratory Judgment and render the coercive relief that the [December 10th Order] did not include.").

As such, the impact of the ongoing litigation in *National TPS Alliance* remains uncertain. *See Mendez Nava v. Noem*, Case No. 1:26-cv-01716-JLT-SAB-HC, 2026 WL 981167, at *4 (E.D. Cal. Apr. 13, 2026), *report and recommendation adopted*, No. 1:26-CV-01716 JLT SAB (HC), 2026 WL 1049042, at *4 n.5 (E.D. Cal. Apr. 17, 2026) (declining to address a habeas petitioner's TPS claim "given the 'winding history,' 'prolonged litigation,' . . . and uncertainty regarding the impact of the Ninth Circuit affirming the district court's partial summary judgment and setting aside the Secretary's vacatur and termination of Venezuela's TPS designation, . . . and the district court's declaratory judgment . . . in light of the Supreme Court's prior grant of a stay") (internal citations omitted).

Even if Respondents are precluded from arguing that DHS's vacatur and termination orders are lawful, and assuming the Supreme Court's stay is lifted, the Court finds that Petitioner's release on the basis of his prior TPS is not appropriate at this time. Petitioner advances no argument or evidence demonstrating that his TPS extended beyond its original expiration on April 2, 2025, without USCIS's approval of his re-registration application. The 2025 Extension allowed for "existing TPS beneficiaries to retain TPS through October 2, 2026, if they otherwise continue to meet the eligibility requirements" and if they "appropriately . . . re-register under this Notice *and are approved by USCIS.*" 90 Fed. Reg. at 5962–63 (emphasis added). Although Petitioner's re-registration application was timely under the 2025 Extension,[4] the Court cannot assume that it would have been approved or that Petitioner remains eligible based on the current record. *See Ramirez Perez v. Schmidt*, No. 26-CV-0158-BHL, 2026 WL 867765, at *4 (E.D. Wis. Mar. 30, 2026) ("There is no

___

[4] The 2025 Extension's "re-registration period for existing beneficiaries [ran] from January 17, 2025, through September 10, 2025." 90 Fed. Reg. at 5962.

3:26-cv-01265-RBM-MMP

authority that suggests TPS is established by virtue of a petitioner filing an application and . . . determining whether a foreign national is prima facie eligible for TPS is a decision for USCIS, not a federal district court."); *Guevara v. Warden, Fla. Soft Side S.*, Case No.: 2:26-cv-01193-SPC-DNF, 2026 WL 1191016, at *2 (M.D. Fla. May 1, 2026) (denying habeas relief and finding that petitioner did not have TPS, even if the Supreme Court stay expired, because his renewal application had not been approved and petitioner made "no effort to explain how his TPS could have extended beyond April 2, 2025, without USCIS approval."). As § 1254a(d)(4) only applies to TPS recipients, not applicants, Petitioner has not demonstrated that he had valid TPS and its protections against detention at the time of his most recent re-detention. *See Geincharles v. Rokosky*, Case No. 26-cv-00150-ESK, 2026 WL 266093, at *3 (D.N.J. Feb. 2, 2026) ("By its plain language, § 1254a(d)(4) only applies to noncitizens who are TPS recipients; TPS applicants are protected from removal while their applications were being considered, but not detention.").

Petitioner therefore fails to establish that he was detained in violation of the TPS statute. *See Rokhfirooz v. Larose*, 804 F. Supp. 3d 1095, 1097 (S.D. Cal. 2025) ("A prisoner bears the burden of demonstrating that 'he is in custody in violation of the Constitution or laws or treaties of the United States.'") (quoting 8 U.S.C. § 2241(c)(3)).

**B.     Due Process**

Petitioner claims his detention violates his substantive due process rights because he cannot be removed under the TPS statute. (*See* Doc. 1 ¶¶ 40–44, 49–51; Doc. 2 at 12–13.) Respondents do not address Petitioner's due process claim. (*See generally* Doc. 5.) Instead, "Respondents acknowledge that Petitioner is detained under 8 U.S.C. § 1226(a) and is entitled to an order from this Court directing a bond hearing be held pursuant to 8 U.S.C. § 1226(a)." (*Id*. at 2.)

"[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (9th Cir. 2001). "[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience, or

8

interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (cleaned up).  Governmental action that infringes a fundamental right is constitutional only if "the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).  By contrast, governmental action that does not infringe a fundamental right survives "substantive-due-process scrutiny so long as [the action is] rationally related to legitimate government interests." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015) (internal quotation marks omitted).

Substantive due process requires that all forms of civil detention, including immigration detention, bear a "reasonable relation" to a legitimate, non-punitive purpose. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).  "A due process violation occurs when detention becomes punitive rather than regulatory, meaning there is no regulatory purpose that can rationally be assigned to the detention or the detention appears excessive in relation to its regulatory purpose." *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021) (citing *Salerno*, 481 U.S. at 747).  In the immigration context, "[d]ue process protects against immigration detention that is not reasonably related to the legitimate purpose of effectuating removal or protecting against danger and flight risk." *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) (citing *Zadvydas*, 533 U.S. at 690–91).  "[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

In this case, Petitioner was detained upon his initial entry into the United States in November 2021 and released on his own recognizance shortly thereafter.  (Doc. 1 ¶ 16.) His release "reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Petitioner therefore "gained a liberty interest in [his] continued freedom when DHS elected to release [him] on [his] own recognizance under section 1226(a), which implied a promise

3:26-cv-01265-RBM-MMP

that [he] would not be re-detained so long as [he] abided by the terms of [his] release." *Valencia Zapata v. Kaiser*, 801 F. Supp. 3d 919, 934 (N.D. Cal. 2025). Thus, Petitioner has a constitutionally protected liberty interest in his release.

"Once a noncitizen has been released, [the Government] must be able to present evidence of materially changed circumstances—namely, evidence that the noncitizen is in fact dangerous or has become a flight risk, or is now subject to a final order of removal." *Saravia*, 280 F. Supp. 3d at 1176. The record before the Court, however, indicates at least some evidence of a material change of circumstances. In June 2025, Petitioner was detained by ICE after his DUI conviction and released in October 2025 subject to certain conditions, including an ankle monitor, regular ICE check-ins, and enrollment in an ATD program. (Doc. 1 ¶¶ 21–23; Doc. 10-2 at 3.) Petitioner was re-detained on January 4, 2026, while he was in the Nassau County Police Department's custody following his arrest and misdemeanor charges for operating a motor vehicle without a court-ordered ignition interlock device and aggravated unlicensed operation of a motor vehicle. (Doc. 1 ¶ 24.) Petitioner's criminal history and potential noncompliance with release conditions may warrant reassessment of his risk of flight or dangerousness. *See Chateauneuf v. Chestnut*, No. 1:26-cv-01073-DC-JDP (HC), 2026 WL 523695, at *4 (E.D. Cal. Feb. 25, 2026) (holding the government "alleged some reason why circumstances warrant" the petitioner's detention because she "was detained directly following her arrest for driving without a license"); *Peralta Ayala v. Wofford*, No. 1:26-cv-00555-DJC-AC, 2026 WL 249567, at *2 (E.D. Cal. Jan. 30, 2026) (finding petitioner's arrest "in connection with unrelated criminal offenses . . . are the sorts of subsequent events that might constitute a change in circumstances.").[5]

---

[5] The Court notes this may also indicate another basis for Petitioner's re-detention, aside from his immigration status, which further undermines his claim for violations of the TPS statute. *See Ladouceur v. Warden, Golden State Annex*, No. 1:26-cv-00881-DJC CSK, 2026 WL 693976, at *2 & n.4 (E.D. Cal. Mar. 12, 2026), *report and recommendation adopted*, No. 1:26-CV-0881 DJC CSK, 2026 WL 825762 (E.D. Cal. Mar. 24, 2026) (noting

Because Petitioner is subject to discretionary detention under 8 U.S.C. § 1226(a) and Respondents concede that he is entitled to a bond hearing (*see* Doc. 5 at 2), the Court finds an initial bond hearing is the appropriate remedy to determine whether Petitioner is a flight risk or danger to the community. *See Chateauneuf*, 2026 WL 523695, at *4 ("[W]here . . . a changed circumstance warrants a petitioner's immigration detention, the proper remedy for a failure to provide a bond hearing is a post-deprivation bond hearing, not immediate release.") (citations omitted); *see also Padilla*, 704 F. Supp. 3d at 1172 (recognizing substantive due process necessitates bond hearings because "non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals").

## IV.   CONCLUSION

Based on the foregoing reasons, the Petition (Doc. 1) is **GRANTED IN PART**. To the extent that Petitioner requests to be released from custody, the Petition is **DENIED WITHOUT PREJUDICE**. Accordingly, the Court further **ORDERS** as follows:

1. Respondents are **ORDERED** to provide Petitioner with an individualized bond hearing under 8 U.S.C. § 1226(a) **within ten (10) days** of the entry of this Order, to the extent Petitioner has not already received such a bond hearing.

2. At the bond hearing, Respondents shall bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight.

---

that while the parties addressed the status of petitioner's TPS, respondents claimed petitioner with valid TPS "was detained for violating the terms of his release, and confirm[ed] that he was not for his TPS immigration status"); *see also Gudino v. Lowe*, CIVIL ACTION NO. 1:25-CV-00571, 2026 WL 526366, at *5 (M.D. Pa. Feb. 25, 2026) ("TPS status does not prevent ICE from detaining noncitizens based on a violation of [a post-removal] order of supervision."); *cf. Salas Leon v. Chestnut*, No. 1:26-cv-01080-DC-AC (HC), 2026 WL 523231, at *1 (E.D. Cal. Feb. 25, 2026) (noting petitioner asserting TPS claim had not been arrested or charged with a crime).

3:26-cv-01265-RBM-MMP

3. Respondents **SHALL FILE** a status report on or before May 29, 2026, indicating whether and when Petitioner received a bond hearing and the outcome of such hearing.

4. The TRO Motion (Doc. 2) is thereby **DENIED AS MOOT**.

   **IT IS SO ORDERED**.

DATE:  May 13, 2026

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

12

3:26-cv-01265-RBM-MMP